
#400

PBT

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| J.H., by and through his parents,<br>M.D. and M.H,<br><br>    Plaintiffs,<br><br>v.<br><br>ROSE VALLEY CHORUS & ORCHESTRA,<br>PAULA GONZALEZ,<br>BARBARA MATHESON,<br>EDWIN NEALLEY,<br>KEN CLARK,<br>JOHN KAUFFMAN,<br>CHRIS RUBINO,<br>ROBERT MOORE, and<br>CATHY WAKEFIELD,<br>    Defendants. | Civil Action No. **18 925**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

### I. PRELIMINARY STATEMENT

1. Plaintiff J.H. is an autistic child who, while he may need to work harder than neurotypical persons to engage with others socially and emotionally, is a skilled, experienced singer and actor in musical theatre. He has performed in 18 musical theatre productions in his young life. And up until October 2017, musical theatre was the activity in J.H.'s life where he routinely experienced success, and from which he developed and maintained a positive self-concept.

2. In March 2017, an agent of Defendant Rose Valley Chorus & Orchestra ("RVCO") recruited J.H. to join RVCO's Fall 2017 production of Gilbert & Sullivan's *The Mikado* after seeing J.H. compete in a March 2017 singing contest. That agent of RVCO knew J.H. had Autism Spectrum Disorder in March 2017 when he recruited him. J.H. auditioned for the company, just the same as his non-disabled castmates. Defendants, who were aware of J.H.'s diagnosis and its manifestations, accepted him.

3. Then, after six weeks of rehearsals, with only two weeks to go until opening night, and with no prior efforts at giving J.H. the kind of constructive feedback that it gave to his neurotypical castmates, Defendants kicked J.H. out of the company because of his "autistic behaviors."

4. The message underlying Defendants' abrupt decision to kick J.H. out of *The Mikado* company – "You don't deserve feedback because autistic people can't use it." – was as clear to J.H. as it is offensive.

5. As a result of Defendants' discrimination and emotional abuse, J.H. has grown more withdrawn, more self-critical, and less able to regulate his negative emotions. And when asked whether he wants to audition for another musical and re-connect with the activity he used to love most of all, J.H. gives only one answer: "They'll just kick me out because I'm autistic."

## II.   JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over Plaintiffs' claims under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation ("Section 504"), as those claims arise under the laws of the United States. *See* 20 U.S.C. § 12181, *et seq. and* 29 U.S.C. § 701, *et seq.*

7. This Court has supplemental jurisdiction over the Pennsylvania law claims in this case pursuant to 28 U.S.C. § 1367. Plaintiffs' state law claims are so related to the claims that are within this Court's original jurisdiction that they form part of the same case or controversy.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims set forth herein occurred within the jurisdiction of this Court.

## III.   PARTIES

9. J.H., born March 10, 2003, resides with M.D. ("Mother") and M.H. ("Father"), collectively, ("Parents") at 3710 Highland Drive, Great Valley, PA within the bounds of the Eastern District of Pennsylvania.

10. J.H. has a diagnosis of Autism Spectrum Disorder, and is a "qualified individual with a disability" within the meaning of Section 504, 29 U.S.C. § 705(20), and Title III of the ADA, 42 U.S.C. § 12131(2), 28 C.F.R. § 35.104.

11. Defendant RVCO is a Pennsylvania non-profit corporation and recipient of a tax exemption under Section 501(c)(3) of the Internal Revenue Code. It leases and operates places of public accommodation to conduct its activities and is thus is required under Title III of the ADA and Section 504 to welcome qualified persons with disabilities and integrate them into their activities. RVCO is accordingly prohibited from discriminating against any individual with a disability who is otherwise qualified to participate in its activities on the basis of his or her disability.

12. Paula Gonzalez is a member of the Board of Directors of RVCO. Her contact information is currently unknown to Plaintiff, but on information and belief, she resides within the

geographic jurisdiction of the Eastern District of Pennsylvania. Individually and in concert with the other Defendants, Ms. Gonzalez knowingly discriminated against, directed discrimination against, and/or participated in discrimination against J.H.

13. Barbara Matheson is a member of the Board of Directors of RVCO. She resides at 1549 Olster Court in West Chester, Pennsylvania, within the bounds of the Eastern District of Pennsylvania. Individually and in concert with the other Defendants, Ms. Matheson knowingly discriminated against, directed discrimination against, and/or participated in discrimination against J.H.

14. Edwin Nealley is a member of the Board of Directors of RVCO. He resides at 2709 Pine Valley Lane in Ardmore, Pennsylvania, within the bounds of the Eastern District of Pennsylvania. Individually and in concert with the other Defendants, Mr. Nealley knowingly discriminated against, directed discrimination against, and/or participated in discrimination against J.H.

15. Ken Clark is a member of the Board of Directors of RVCO. He resides at 1003 Richmond Road, Broomall, Pennsylvania, within the bounds of the Eastern District of Pennsylvania. Individually and in concert with the other Defendants, Mr. Clark knowingly discriminated against, directed discrimination against, and/or participated in discrimination against J.H.

16. John Kauffman is a member of the Board of Directors of RVCO. His contact information is currently unknown to Plaintiff, but on information and belief, he resides within the geographic jurisdiction of the Eastern District of Pennsylvania. Individually and in concert with the other Defendants, Mr. Kauffman knowingly discriminated against, directed discrimination against, and/or participated in discrimination against J.H.

17. Chris Rubino is a member of the Board of Directors of RVCO. He resides at 912 Alexander Avenue in Drexel Hill, Pennsylvania, within the bounds of the Eastern District of Pennsylvania. Individually and in concert with the other Defendants, Mr. Rubino knowingly discriminated against, directed discrimination against, and/or participated in discrimination against J.H.

18. Robert Moore is a member of the Board of Directors of RVCO. He resides at 806 Painters Crossing in Chadds Ford, Pennsylvania, within the bounds of the Eastern District of Pennsylvania. Individually and in concert with the other Defendants, Mr. Moore knowingly discriminated against, directed discrimination against, and/or participated in discrimination against J.H.

19. Cathy Wakefield is a member of the Board of Directors of RVCO. She resides at 923 Jewel Davis Drive in Chadds Ford, Pennsylvania, within the bounds of the Eastern District of Pennsylvania. Individually and in concert with the other Defendants, Ms. Wakefield knowingly discriminated against, directed discrimination against, and/or participated in discrimination against J.H.

## IV. FACTS

20. J.H is a 14-year-old child with a diagnosis of high-functioning Autism Spectrum Disorder. Like many on the autism spectrum, J.H. struggles with recognizing nonverbal cues and using social pragmatic language. He is, however, well-acquainted with his disability and the fact that he processes spoken and unspoken communication differently than neurotypical persons. In particular, J.H. knows that he will often understand spoken language differently than neurotypical individuals.

21. It is sadly common for high-functioning autistic children to face frequent frustration, ridicule, and exclusion for being neuroatypical. It is also common for high-functioning autistic children to have areas of exceptional strength, interest, and focus where they experience authentic success and acceptance. Individuals with ASD can and do excel in multiple fields, including the arts.

22. J.H.'s particular strength is in music performance. From a young age up until October 2017, J.H. had a deep appreciation of, and abiding love for, musical performance. He is a skilled singer and follows both stage direction and choreography meticulously. J.H. began performing in productions in his community and school at a young age. He has participated in 18 different productions in his 14 years.

23. On 22 April 2017, J.H. participated in a singing contest. The audience gave him a standing ovation. William DeFeo, member of the board of RVCO, attended this contest. And in July 2017, Mr. DeFeo contacted J.H.'s mother directly to ask that J.H. audition for RVCO's production of *The Mikado*. Mr. DeFeo was aware of J.H.'s autism diagnosis.

24. J.H. enthusiastically agreed. Mr. DeFeo put J.H.'s mother in touch with Robert Moore, the director of *The Mikado*. Defendant Moore and J.H.'s mother corresponded over the summer of 2017. J.H.'s mother made Defendant Moore aware of J.H.'s autism, making sure he was agreeable to accepting a teenager with a disability into a cast comprised predominately of adults. Defendant Moore, indicating no concerns, encouraged J.H. to audition.

25. On September 10, 2017, J.H. auditioned for *The Mikado* and earned his place in the company. At this time, J.H.'s mother spoke extensively to Defendant Cathy Wakefield and Defendant Moore, in the presence of Mr. DeFeo, about J.H.'s diagnosis of autism. Both Defendant Wakefield and Defendant Moore indicated they were well-equipped to work with a child with special needs and saw no issue with him joining the cast.

26. J.H. joined the cast of *The Mikado,* giving up the opportunity to participate in the fall show with his school's theatre company, where he has participated in productions for years and been welcomed as a member of the cast of every such show.

27. J.H. participated in all rehearsals, learned all his music and choreography, and, along with his family, became an enthusiastic booster of RVCO. He and his parents donated their

time and own money in support of RVCO's fundraising efforts, and helped drive program ad sales. J.H.'s parents not only attended every rehearsal, they videoed many of the rehearsals to help him master what was asked of him by RVCO. J.H.'s parents also made all the conductors and pianists for the production aware of J.H.'s autism.

28. J.H. understands that because of his ASD, he processes language differently than others. He is also eager to do what is asked of him precisely. J.H. thus can be apt to ask questions at a level of detail or at a length that others find unhelpful or distracting.

29. Where that has happened during rehearsals with theatre companies other than RVCO, J.H.'s directors and peers would give him prompt, direct feedback to let him know whether his questions were distracting from the process. J.H. would accept the constructive criticism and either ask fewer questions or save his questions for later.

30. Parents are also very familiar with J.H.'s needs and behaviors. They know how to effectively communicate to J.H. when his questions are distracting to others, or when he may be missing nonverbal social cues. Parents made themselves available to RVCO throughout the rehearsal process to address any such issues.

31. Throughout the first six weeks of rehearsal, no one – not J.H.'s fellow performers in *The Mikado*'s company, and not any of Defendants (including Defendant Moore who was the show's stage director) – gave J.H. any feedback about his questions or his demeanor in rehearsal.

32. On 15 October 2017, however, just two weeks before opening night, Defendant Moore approached Parents and informed them that all of the Defendants together had decided that J.H.'s numerous questions during rehearsal were frustrating the cast and crew. Defendants had never communicated this criticism to J.H. or Parents previously.

33. Defendant Moore and his fellow Defendants then told Parents that they had decided together that J.H. was to be dismissed from the cast of *The Mikado*. When Parents asked Defendants why, one of the Board members answered on behalf of the Board that it was because the cast and RVCO were "uncomfortable" with J.H.'s "autistic behaviors."

34. Defendants did not provide feedback to J.H. throughout the six weeks of rehearsals to inform him that his questions were distracting. By contrast, Defendants had reliably given feedback to Josh's neurotypical castmates.

35. Recognizing the impact that Defendants' abrupt dismissal of J.H. would have on their child, Parents pled for Defendants to reconsider. Parents knew that if Defendants simply informed J.H. that his questions were too long or coming at an inopportune time, he would adjust his behavior. After all, J.H.'s desire in asking the questions in the first place was to make sure he was doing what was required of him to be an asset to the show.

36. Parents suggested that instead of removing J.H. from the production, Defendant Moore should give J.H. prompt feedback to J.H. that he should save his questions for later.

5

Defendants agreed J.H. could come back to rehearsal the next day on the condition that, if Defendant Moore believed J.H. was asking too many questions at an inappropriate time, he would communicate this to J.H. by placing a finger to his mouth.

37. Defendants did not, however, follow this plan. Instead, Defendants – who had known at least since the beginning of rehearsals for *The Mikado* about J.H.'s high-functioning ASD – told all of J.H.'s castmates about the nonverbal cue.

38. During the next day's rehearsal on 16 October 2017, J.H. discovered that nearly all of the castmates who had never said a word to him about his questions were suddenly shushing him every time he spoke.

39. J.H. felt humiliated and alienated, but he persevered through the rehearsal. Mr. DeFeo reported to J.H.'s father that J.H. had done a great job at rehearsal that day, and Defendant Moore reinforced the same sentiment to J.H. when J.H. directly asked him how he was doing

40. Nevertheless, the next day on 17 October 2017, Mr. DeFeo provided a warning to Mother that the Board still intended to remove J.H. from the production, after it had met without Mr. DeFeo being present. Mr. DeFeo indicated to J.H.'s parents that he vehemently opposed the Board's decision.

41. Defendant Wakefield called J.H.'s mother at approximately 8:45 p.m. on 17 October 2017and told her, once again, that J.H. was no longer welcome in RVCO's production. Defendant Wakefield again repeatedly stated during the phone call that RVCO could not handle J.H.'s "autistic behaviors." In essence, Defendants took the position that J.H. was unworthy to participate in *The Mikado* because his "autistic behaviors" had not been cured by one day's worth of people who had once treated him as a peer suddenly treating him as one would a young child.

42. J.H. was devastated by RVCO's dismissal. Parents and the therapist he has seen since he was 11 saw an immediate decline in his self-concept and emotional regulation. Parents also watched J.H. withdraw from the world. He has had an increase of disruptive behaviors at home and at school. His performance in school and in social settings has worsened. Overall, J.H. continues to be markedly lower-functioning socially, behaviorally, and emotionally than he was prior to October 2017.

43. Perhaps most sadly, J.H.'s lesson from this experience was that he should not audition for another show because he will be kicked out due to his disabilities. He feels isolated, diminished, and ashamed. In short, by treating J.H. as less of a person than his castmates because he is autistic, and then blaming him for not correcting what they call "autistic behaviors," Defendants have made J.H. averse to the one activity that used to be his sole source of unadulterated joy.

## V.     CLAIMS

### COUNT I- DISCRIMINATION PURSUANT TO 42 U.S.C. § 12203(b)
(Against Defendant RVCO)

44.   Paragraphs 1 through 37 are incorporated herein by reference.

45.   Title III of the ADA prohibits discrimination against individuals "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any private entity who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 665 (2001)

46.   A non-profit organization may be charged with discrimination under Title III if it owns, leases (or leases to), or operates a place of public accommodation. *See PGA Tour, Inc.*, 532 U.S., at 661. Title III defines places of public accommodation to include: places of exhibition or entertainment, such as a theater; places of public gathering, such as an auditorium; and any other place of exercise or recreation. 42 U.S.C. § 12181(7). Legislative history indicates the phrase 'public accommodation' should be construed liberally to afford people with disabilities equal access to the wide variety of establishments available to the nondisabled. *See PGA Tour, Inc.*, 532 U.S., at 667 (citing S. Rep. No. 101-116, at 59; H. R. No. 101-485, pt. 2, at 100).

47.   RVCO has intentionally, purposefully, and with deliberate indifference violated the rights of J.H. secured by the Americans with Disabilities Act of 1990, 42 U.S.C. § 12181 *et seq.* and 28 C.F.R. Part 36 by:

   a.   Subjecting J.H. to discrimination on the basis of his disabilities and the severity of his disabilities, in violation of 42 U.S.C. § 12182 and 28 C.F.R. §36.201(a);

   b.   Denying J.H., on the basis of his disabilities, the opportunity to participate in and benefit from the services, programs, and activities of RVCO, in violation of 28 C.F.R. § 36.202(A).

   c.   Failing to provide J.H. an opportunity to participate in and benefit from RVCO'S services, programs, and activities that is equal to the opportunity afforded to individuals without disabilities, in violation of 28 C.F.R. § 36.202(b);

   d.   Refusing to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination against J.H., in violation of 28 C.F.R. § 36.302(a);

**WHEREFORE**, Plaintiffs request the following relief:

- a. Compensatory damages to plaintiffs against defendants jointly and severally;
- b. Punitive damages to plaintiffs against defendants jointly and severally;
- c. An award of attorney's fees and costs; and
- d. Such other and further relief as appears reasonable and just.

## COUNT II – DISCRIMINATION PURSUANT TO 29 U.S.C.S. § 794
(Against Defendant RVCO)

48. Paragraphs 1 through 46 are incorporated herein by reference.

49. Under Section 504, no otherwise qualified individual with a disability shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 29 U.S.C.S. § 794.

50. Upon in formation and belief, RVCO is a recipient of Federal financial assistance as a 501(c)(3) organization and/or as a recipient of Federal grant monies;

51. RVCO has intentionally, purposefully, and/or with deliberate indifference violated the rights of J.H. secured by Section 504 of the Rehabilitation Act of 1973, *as amended*, 29 U.S.C. § 794 and 34 C.F.R. § 104.4, by subjecting J.H. to discrimination on the basis of his disability.

**WHEREFORE**, Plaintiffs request the following relief:

- a. Compensatory damages to plaintiffs against defendants jointly and severally;
- b. Punitive damages to plaintiffs against defendants jointly and severally;
- c. An award of attorney's fees and costs; and
- d. Such other and further relief as appears reasonable and just.

## COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(Against All Defendants)

52. Paragraphs 1 through 50 are incorporated herein by reference.

53. Defendants engaged in deliberate actions against J.H., both individually and in concert, to remove him from an activity into which he had invested significant time, energy, and money. RVCO did so in a way that was demeaning to J.H.

54. Defendants' conduct, both individually and in concert, was extreme and outrageous.

55. The sudden dismissal just weeks before the production was to open, combined with the treatment of J.H. immediately prior, caused J.H. severe emotional distress. J.H. has experienced symptoms after the dismissal which include headaches, increased heartrate, repeated feelings of panic or being trapped, and decreased social, behavioral, and emotional functioning, as well as an increased need for medication and psychotherapy.

56. J.H.'s has experienced a diminished enjoyment of life. It is no exaggeration to say that Defendants' actions cut him off from the thing in life he used to love most.

WHEREFORE, Plaintiffs request the following relief:

   a. Compensatory damages to plaintiffs against defendants jointly and severally;

   b. Punitive damages to plaintiffs against defendants jointly and severally; and

   c. Such other and further relief as appears reasonable and just.

## COUNT IV – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
(Against All Defendants)

57. Paragraphs 1 through 55 are incorporated herein by reference.

58. Defendants took on the responsibility to include J.H. by casting him in its production and accepting his payment to participate while fully aware of his disability. RVCO therefore owed J.H. a special duty to promote his best interests.

59. Defendants, who not only knew of J.H.'s diagnosis but had worked with J.H. for six weeks before dismissing him, knew or should have known that their callous dismissal would cause J.H. severe emotional harm.

60. Defendants nonetheless kicked J.H. out of its production of *The Mikado*. They did so because (1) they found what they termed his "autistic behaviors" – or, as those behaviors are more commonly known, "questions" – distracting, and (2) they assumed, based only on J.H.'s diagnosis of Autism Spectrum Disorder, that J.H. could not accept or use constructive criticism.

61. As indicated in paragraphs 38-42, RVCO's negligent act resulted in physical and emotional suffering. J.H. has experienced symptoms after the dismissal which include headaches, increased heartrate, repeated feelings of panic or being trapped, and decreased social, behavioral, and emotional functioning, as well as an increased need for medication and psychotherapy.

**WHEREFORE**, Plaintiffs request the following relief:

a. Compensatory damages to plaintiffs against defendants jointly and severally;

b. Punitive damages to plaintiffs against defendants jointly and severally; and

c. Such other and further relief as appears reasonable and just.

Dated: 2 March 2018

Respectfully Submitted,

_____
Michael D. Raffaele (PA ID 91615)
Frankel & Kershenbaum, LLC
1230 County Line Road
Bryn Mawr, PA 19010
(610) 922-4200
(610) 646-0888 [fax]
Michael@MyKidsLawyer.com

_____
Grace Osa-Edoh (PA ID 323679)
Frankel & Kershenbaum, LLC
1230 County Line Road
Bryn Mawr, PA 19010
T: (610) 922-4200
F: (610) 646-0888
Grace@MyKidsLawyer.com